IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| HELEN MAY SKIVER, ) | |
| ) | |
| Claimant, ) | |
| ) | |
| v. ) | |
| ) | CIVIL ACTION NO. |
| NANCY A. BERRYHILL, ) | 7:17-CV-00861-KOB |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Respondent. ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On July 29, 2014, the claimant, Helen May Skiver, applied for disability insurance benefits under Title II of the Social Security Act and Supplemental Security Income benefits under Title XVI of the Social Security Act. (R. 97-98). The claimant alleged disability, commencing on July 14, 2014, because of diabetes mellitus with neuropathy, degenerative disc disease, carpal tunnel syndrome, right arm nerve damage, depression, avoidant personality disorder, borderline personality disorder, and anxiety. (R. 39, 207, 792). The Commissioner denied the claims on September 3, 2014, and the claimant filed a timely request for a hearing before an Administrative Law Judge (ALJ). (R. 134-35). The ALJ held the hearing on January 11, 2016. (R. 30-62).

In a decision dated May 6, 2016, the ALJ denied disability benefits to the claimant. The ALJ held that the claimant was not disabled, as defined by the Social Security Act, and, therefore, was ineligible for Social Security benefits. (R. 11). On April 14, 2017, the Appeals

Council declined to grant review of the ALJ's decision. (R. 1-6). The claimant has now appealed her decision to this court, which has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES and REMANDS the decision of the Commissioner.

## II. ISSUE PRESENTED

Whether the ALJ erred in giving consultative examiner Dr. Storjohann's opinion only some weight.[1]

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the

---

[1] The claimant raised other issues; however, because the court is reversing and remanding on the issue of the level of weight attributed to Dr. Storjohann's medical opinion, the court will not address the other issues.

Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

This court has a duty to ensure that the Secretary "exercised reasoned decision-making" in his fact finding and policy judgments. *Owens v. Heckler*, 748 F.2d 1511, 1514 (11th Cir. 1984). In determining the level of weight to provide a medical opinion, including an examining physician, "[t]he ALJ is to consider a number of factors in determining how much weight to give to each medical opinion: (1) whether the doctor has examined the claimant; (2) the length, nature, and extent of a treating doctor's relationship with the claimant; (3) the medical evidence and explanation supporting the doctor's opinion; (4) how consistent the doctor's 'opinion is with the record as a whole'; and (5) the doctor's specialization." *Brown v. Comm'r of Soc. Sec.*, 442 F. App'x 507, 511 (11th Cir. 2011). Refusal by the ALJ to accord proper weight to the opinion of

a consultative examining physician is cause for reversal. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1268 (11th Cir. 2015).

## V.  FACTS

The claimant was thirty-six years old at the time of the ALJ's final decision; has a high school education and two years of college; has past work experience as a cashier and a part-time housekeeper; and alleges disability based on diabetes mellitus with neuropathy, carpal tunnel syndrome, right arm nerve damage, degenerative disc disease, depression, avoidant personality disorder, borderline personality disorder, and anxiety. (R. 11, 39, 54, 105, 207, 792).

*Physical and Mental Impairments*

In 2006, while the claimant was a student at the University of Alabama, Jacalyn Tippey, Ph.D. diagnosed the claimant with a math and reading disorder. The claimant indicated to Dr. Tippey that she had dyslexia, which impaired her academic performance. After meeting with and assessing the claimant, Dr. Tippey wrote that the claimant seemed pleasant, cooperative, and forthcoming. Dr. Tippey recommended that the claimant be allowed to tape class lectures, use a calculator for simple calculations, use her laptop in class to take notes, and be given additional time to complete class assignments. (R. 655-56).

On January 20, 2011, the claimant presented to the emergency department at DCH Regional Medical Center complaining of lower back pain. She had experienced the pain for two days prior, and indicated her pain was an eight out of ten on the pain scale. Dr. Alan Heins assessed that the claimant had acute lower back pain, particularly a lumbar strain. Dr. Heins prescribed the claimant Naproxen 500 mg and Tramadol and discharged her in stable condition later the same day. (R. 560-67).

4

The claimant again went to the emergency department at DCH Regional Medical Center on October 19, 2011, because she feared she had taken too much insulin. The claimant reported that, around 12:45 a.m., she took eleven units of Humilin insulin, sixty units of Lantus insulin, and also ate an ice cream sandwich. The claimant stated that she came to the emergency department because her glucose level dropped too quickly, and she suddenly felt shaky, nauseated, and lightheaded. Dr. Jeremy Pepper assessed that the claimant had nausea and hyperglycemia. Dr. Pepper instructed the claimant to drink plenty of no-sugar liquids and to take her insulin as ordered. Dr. Pepper discharged the claimant approximately one hour after her arrival at the emergency department. (549, 554, 558).

On November 19, 2012, the claimant returned to the emergency department at DCH Regional Medical Center for upper back and neck pain, numbness, and tingling. The claimant assessed her pain as a seven out of ten on the pain scale, and she indicated that she heard a "pop" in her neck earlier in the day. Dr. Cristi Vaughn ordered an x-ray of the claimant's spine that revealed cervical disc disease that caused the numbness and tingling in her arms. However, the x-ray showed no evidence of fracture, dislocation, or significant arthritis, and Dr. Vaughn discharged the claimant approximately three-and-a-half hours after her arrival at the medical center. (R. 467, 478).

Dr. James Geyer of Northport Medical Center completed a nerve conduction study on the claimant, at the request of Dr. James Robinson at the Good Samaritan Clinic, on March 27, 2013. Dr. Geyer indicated that nerve conduction velocities were slow in the left sural sensory nerve and in the left peroneal motor nerve. However, he concluded that nerve conduction velocities in the right sural sensory nerve, the right peroneal motor nerve, and bilateral posterior tibial motor

nerves were within normal limits. The findings of the study were consistent with neuropathy, particularly involving the left lower extremity. (R. 652).

The claimant visited Dr. Fred Graham of West Alabama Spine & Pain Specialists on July 31, 2013, complaining of pain in her neck, right arm and lower back. Dr. Graham examined the claimant and ordered an MRI of her cervical spine. On September 5, 2013, Dr. Elizabeth Caldwell of the Radiology Clinic, LLC completed the MRI that showed cervical degeneration. Dr. Caldwell compared the MRI results to a previous 2007 MRI[2] and reported a slight worsening in mild annular disc bulging and spondylosis at C5-C6, with an additional small central inferior disc extrusion. She also reported minimal ventral cord surface molding; possible right C6 impingement; and mild bilateral degenerative disc disease at C3-C4 and C4-C5 without impingement. Ultimately, however, Dr. Caldwell concluded that the changes between the two MRIs were minimal. (R. 570-75).

The claimant sought treatment at DCH Regional Medical Center on January 24, 2014, complaining of a panic attack and a psychiatric disorder. The claimant reported feeling dizzy and admitted to drinking too much alcohol the night before. Dr. Russell Scholl ordered a chest x-ray that showed no pulmonary filtrate; stabilized the claimant's condition; and discharged her on January 25, 2014. (R. 308-09, 332-33).

The claimant received two selective nerve root block injections from Dr. Graham at the Tuscaloosa Surgical Center to relieve back and neck pain in 2014. The first injection occurred on March 18, 2014, and the last injection happened on July 15, 2014. (R. 101, 596).

On June 11, 2014, Dr. Angella Woodward ordered an MRI of the claimant's cervical spine at the DCH Regional Medical Center Department of Imaging Services. Dr. David Smith reported, by way of comparison with the September 13, 2013, MRI, the presence of a broad-

---

[2] The record does not provide any details or results of the September 7, 2007 MRI.

based disc osteophytic bulge with mild central disc protrusion. Dr. Smith also reported the development of endplate edema; however, the MRI ultimately showed no abnormality and no obvious impingement. (R. 637-38).

Dr. Robert Slaughter completed a nerve conduction study on the claimant's upper extremities on June 26, 2014. Dr. Slaughter found a slowing of sensory nerve conduction velocities in the median nerves bilaterally and prolonged terminal latency in the right median nerve, indicating bilateral carpal tunnel syndrome. Dr. Slaughter's other findings were normal. (R. 641).

On September 3, 2014, Dr. Robert Estock, a state agency physician, conducted a telephone interview with the claimant. He opined that the claimant did not allege any mental issues on her initial application or during the interview with him, and she did not show difficulties with understanding, coherency, concentrating, talking, or answering questions. Dr. Estock concluded, based upon his telephone interview and review of the medical evidence, that the claimant did not have any severe mental issues that would prevent her from working. (R. 101-02).

The claimant was involved in a motor vehicle accident in late September 2014. Following the accident, the claimant complained of neck pain. On October 7, 2014, Dr. Graham treated the claimant with epidural steroids. The following month, on November 26, 2014, Dr. Graham ordered an MRI of the claimant's cervical and lumbar spine at the Radiology Clinic, LLC. Dr. Hugh Borak compared the cervical spine MRI to the claimant's June 11, 2014, MRI and found diffuse disc bulging; mild uncovertebral osteophytic change; and a small central protrusion. However, Dr. Borak concluded that the findings were unchanged since the previous MRI with no neural impingement. Dr. Borak noted the claimant's October of 2006 lumbar spine MRI and

reported that the 2014 MRI showed some crowding of the descending right L5-S1 nerve root but no definite impingement. (R. 671-79, 698-701).

On October 15, 2014, the claimant visited Dr. Stephen Ikard of the University Orthopaedic Clinic and Spine Center.[3] Dr. Ikard diagnosed the claimant with bilateral carpal tunnel syndrome, with the right hand worse than the left. On October 27, 2014, the claimant underwent endoscopic carpal tunnel release on the right wrist. The claimant followed up with Dr. Ikard on November 5 and November 19, 2014. After the last visit, Dr. Ikard reported significant improvement. He wrote that the claimant had good range of motion, an expected amount of mild soreness, and no significant paresthesia. (R. 659-67).

The claimant visited the Good Samaritan Clinic to discuss her diabetes, neuropathy and depression on December 9, 2014. The doctor[4] instructed the claimant to cut back on her evening mealtime insulin and start taking low-dose Neurontin for her neuropathy. The claimant told the doctor that she felt depressed, that she "doesn't feel like doing anything," and sometimes sits on the couch for days at a time. She denied suicidal ideation at the time of the appointment. The doctor prescribed the claimant Prozac for her depression and referred her to Indian Rivers Mental Health Center for mental treatment. (R. 689).

On January 13, 2015, at her Good Samaritan Clinic follow-up appointment, the claimant indicated that her depression was still a concern but that the Prozac was helping. On February 24, 2015, the claimant visited the Good Samaritan Clinic and had her Prozac prescription refilled. The claimant also had other prescriptions filled between May 2014 and February 2015. According to the claimant's Wal-Mart pharmacy medical expense summary, the claimant last filled her prescription for Meloxicam on May 20, 2014; Cyclobenzapr on June 11, 2014;

---

[3] The record does not state who referred the claimant to Dr. Ikard. However, the visit comes four months after Dr. Slaughter's nerve conduction study that indicated that the claimant had bilateral carpal tunnel syndrome.
[4] The doctor's signature on the Good Samaritan Clinic report is illegible.

Centirizine on February 2, 2015; Permethrin on February 2, 2015; and Prednisone on February 2, 2015. (R. 258, 687-88).

On June 16, 2015, the claimant visited Good Samaritan Clinic complaining of depression. The claimant said she "was in a dark place a few months ago and went off all [her] medication." The claimant reported that she has experienced mood swings and episodes of severe anxiety. The claimant denied suicidal ideation at the time of the appointment. Diagnoses included major depressive disorder and anxious distress. Stephanie Wynn, a certified registered nurse practitioner, increased the claimant's daily Prozac dosage and instructed her to return for a follow-up appointment with the clinic in a few months. (R. 685).

On November 3 and December 1, 2015, at her routine follow-up appointments at Good Samaritan Clinic, the claimant reported elbow pain and asked that her Prozac be reduced from 40 mg to 20 mg because she could not sleep. The medical record discussed the claimant's diabetes, neuropathy, carpal tunnel syndrome, depression and anxiety. As of December 1, 2015, the claimant was taking Humilin insulin and Lantus insulin for her diabetes, Neurontin for her neuropathy, Prozac for her depression, and Ibuprofen and Tylenol for her pain. (R. 780-82).

At the Good Samaritan Clinic for a follow-up appointment on January 5, 2016, the claimant complained of hip pain, muscle weakness, and knee pain. A physical examination showed full range of hip motion but weakness in her thigh.[5] The medical record discussed the claimant's diabetes, neuropathy, and depression, with no new or additional concerns. (R. 778).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insured benefits, the claimant requested and received a hearing before an ALJ on January 11, 2016. At the hearing, the claimant testified that she had a part-time job working as a housekeeper between two and five

---

[5] The record did not indicate which thigh was weak.

days per week. As a housekeeper, she makes beds, dusts, and cleans windows and mirrors in the hotel rooms. However, she testified that other housekeepers helped her complete tasks that required a lot of bending down or getting on her knees, such as taking out the trash. The claimant stated that the work was difficult for her, and that she would not be capable of sustaining full-time employment. She testified that she could not stand for more than twenty minutes at a time; that she tried not to lift anything above five pounds; and that she tripped constantly when she walked because of her neuropathy. (R. 32, 41-43, 58).

In addition to working a part-time job, the claimant testified that she spends the majority of days she is not working lying in her bed or sitting in her rocking recliner because of pain and depression. The claimant stated that she is able to drive, dress herself, go grocery shopping, cook with the assistance of her son, watch television, socialize on Facebook, pay bills, handle money, spend time with her son and attend church. The claimant expressed difficulty driving for more than twenty minutes at a time. (R. 17, 58).

The claimant further testified that a doctor diagnosed her with diabetes when she was twenty-seven. She testified that she currently takes insulin at night and Humulin R at every meal. In addition, she stated that she checks her blood sugar at least six times a day; however, the medicine does not control her diabetes. She testified that her diabetes has manifested itself through the neuropathy; has affected her eyesight; and has caused her to constantly have to use the restroom, particularly at night. (R. 54-57).

The claimant also testified that she experiences depression. When she is depressed, she does not want to do anything. She stated that as an adult she considered killing herself on one occasion, but her son helped to bring her out of her suicidal depression.[6] She testified that the suicidal depression incident lasted a couple of days and required no hospitalization. The claimant

---

[6] The record does not indicate exactly when the suicidal episode happened.

stated that she has tried to get treatment at Indian Rivers Mental Health Center but has been unable to because an appointment at the facility is "three years down the line." The claimant testified that she is currently taking Prozac to help treat her depression. (R. 49, 56-58).

At the conclusion of the hearing, the ALJ told the claimant that he was going to have two doctors who contract with the Social Security Administration examine her and submit written reports on their findings. (R. 61).

*Post-Hearing Evaluations with Dr. Storjohann and Dr. Todorov*

After the ALJ hearing, Dr. Storjohann conducted a psychological evaluation of the claimant on February 19, 2016, and Dr. Todorov conducted a physical evaluation of the claimant on February 29, 2016.

Dr. Storjohann completed an evaluation of the claimant's psychological capabilities. The claimant reported to Dr. Storjohann that she struggled with serious depression since she was in her early teens; that she experienced multiple panic attacks daily before she was on medication; and that even on medication she still experiences multiple panic attacks every week. As a fifteen-year-old, the claimant attempted suicide by slitting her wrist. The claimant stated that she has never been psychiatrically hospitalized; attended a woman's support group for about six months after being raped when she was twenty-two; and takes psychotropic medication prescribed by her personal physician. (R. 789-90).

Dr. Storjohann assessed that the claimant has moderate difficulty understanding and remembering simple instructions; carrying out simple instructions; making judgments on simple work-related decisions; and interacting appropriately with the public. Dr. Storjohann indicated that the claimant has *marked* difficulty understanding and remembering complex instructions; carrying out complex instructions; making judgments on complex work-related decisions;

11

interacting appropriately with supervisor(s); interacting appropriately with co-workers; and responding appropriately to usual work situations and to changes in a routine work setting. (R. 785-86).

Dr. Storjohann indicated that the claimant was cooperative with the evaluation process and appeared to make the best effort at answering all questions to the best of her ability. Dr. Storjohann observed that the claimant was depressed, anxious, and tense. Based on his evaluation and the claimant's psychological history, Dr. Storjohann diagnosed the claimant as having significant mental health difficulties and wrote that her prognosis was poor. He concluded that she was in need of mental health treatment. (R. 792).

On February 29, 2016, Dr. Todorov conducted a physical examination of the claimant. The examination included a review of the claimant's records and past medical history, in addition to a physical examination. Dr. Todorov found that the claimant could continuously lift or carry up to ten pounds; frequently lift or carry between eleven and twenty pounds; occasionally lift or carry between twenty-one and fifty pounds; sit for up to two hours without interruption; stand for one hour at a time; walk for up to thirty minutes at a time; sit for a total of four hours in an eight-hour workday; stand for two hours and walk for one hour in an eight-hour workday; continuously reach and finger on the job; frequently handle, feel, push and pull; continuously operate foot controls; frequently climb stairs and ramps as well as balance; occasionally climb ladders or scaffolds, stoop, kneel, crouch or crawl; and had no environmental limitations. (R. 799-804).

Dr. Todorov concluded that the claimant can do all aspects of daily life but not for long periods of time; she can do work-related activities in a sitting position and stand and walk for a

short period of time; her ability to lift and carry is limited; and she can handle objects for short periods of time. (R. 798).

*The ALJ's Decision*

On May 6, 2016, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through March 31, 2019, and had not engaged in substantial gainful activity since her alleged onset date of July 14, 2014. (R. 11, 16, 24).

Next, the ALJ found that the claimant had the severe impairments of diabetes mellitus II (DM2); neuropathy; right carpal tunnel, status post release surgery (CTS); and lumbar degenerative disc disease (DDD). The ALJ also discussed the claimant's medically determinable mental impairments of anxiety, avoidant personality disorder, borderline personality disorder and depression. The ALJ found that the claimant had no limitation in activities of daily living; mild limitation in social functioning; no limitation in concentration; and no episodes of decompensation for an extended duration because she has not been hospitalized for any type of mental issue. The ALJ supported his findings by pointing to her ability to work as a housekeeper part-time, care for her son, drive her car, pay bills, and attend church. The ALJ found that the claimant's mental impairments, considered singly and in combination, did not cause more than a minimal limitation in the claimant's ability to perform basic mental work activities and were non-severe. (R. 16-19).

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered whether the claimant met the criteria of Listing 1.04, related to disorders of the spine. The ALJ determined that the evidence

failed to show any compromise of the nerve root, which is required to meet the criteria of the section. In making his determination, the ALJ relied on evidence of an MRI of the lumbar spine taken on November 26, 2014. The MRI showed a small central disc protrusion at L5-S1 with crowding of the descending right S1 root, but without definite impingement. Therefore, the ALJ held that the claimant's degenerative disc disease did not meet the criteria of Listing 1.04. (R. 19-20).

The ALJ then discussed Dr. Storjohann's mental examination of the claimant, to which he gave "some weight." The ALJ expressed his opinion that the claimant "is certainly not as limited as opined by Dr. Storjohann." The ALJ explained that he only gave "some weight" to Dr. Storjohann's opinion because the claimant has previous work experience; she currently works as a part-time housekeeper "with no problems"; she has never received any professional mental health treatment; her doctors have noted no significant mental limitations; she has only been treated in the emergency room once for a panic attack after consuming alcohol; she is not currently taking her Prozac according to a printout of her medications; she has not reported ongoing mental issues to any doctor; and she had no complaints at her January 2016 follow-up appointment at Good Samaritan Clinic. (R. 19).

The ALJ also gave "some weight" to Dr. Estock's opinion that the claimant did not have any mental impairment. The ALJ noted that the claimant had not alleged any mental impairment in her application or during her telephone interview with Dr. Estock. However, because of Dr. Storjohann's diagnoses and the claimant's treatment for depression at the Good Samaritan Clinic, the ALJ found the claimant had depression and other mental impairments, but he listed them as non-severe. (*Id.*).

The ALJ next considered that the claimant has the residual functional capacity to perform unskilled sedentary work, but not her past relevant work. In making his determination, the ALJ considered the claimant's subjective allegations and residual functional capacity and pointed to discrepancies between medications the claimant testified she took and a Wal-Mart pharmacy printout indicating prescriptions she has filled. Further, he argued that despite the claimant's medical conditions, objective medical evidence did not support the claimant's *complete* inability to work. Additionally, the ALJ pointed to evidence that the claimant's carpal tunnel syndrome had healed and that the MRIs showed that the claimant's degenerative disc disease was not severe enough to prevent her from performing unskilled sedentary work on a full-time basis. (R. 20, 23).

The ALJ also discussed the claimant's consultative examination with Dr. Todorov. Although the ALJ disagreed with Dr. Todorov's opinion of the length of time the claimant could sit, he gave "good weight" to the doctor's opinion. The ALJ concluded by pointing out that the claimant is currently working on a part-time basis. He reasoned that, if she was truly experiencing debilitating back and foot pain, she would be unable to work at all. (R. 20-23).

Based on the record as a whole, the ALJ found that the claimant had the residual functional capacity to perform unskilled sedentary work. Therefore, the ALJ concluded that the claimant was not disabled as defined in the Social Security Act.

## VI. DISCUSSION

The claimant argues that the ALJ erred in the weight he gave to the opinion of consultating physician Dr. Storjohann because substantial evidence does not support his findings. This court agrees.

15

The ALJ has a responsibility to "consider a number of factors in determining how much weight to give to each medical opinion: (1) whether the doctor has examined the claimant; (2) the length, nature, and extent of a treating doctor's relationship with the claimant; (3) the medical evidence and explanation supporting the doctor's opinion; (4) how consistent the doctor's 'opinion is with the record as a whole'; and (5) the doctor's specialization." *Brown*, 442 F. App'x at 511.

In the present case, Dr. Storjohann professionally examined the claimant. *See id.* The ALJ only gave Dr. Storjohann's post-examination opinion "some weight" because "the claimant is certainly not as limited as opined by Dr. Storjohann." The ALJ noted that the claimant worked in the past and currently works as a housekeeper "with no problems, in particularly [*sic*] mentally." However, the existence of past work experience and the claimant's ability to dust and make beds on a *part-time basis* does not negate the existence of a *mental* impairment that would prevent the claimant from working a full-time job.

The ALJ further argued that the claimant was not taking her Prozac, and he relied on the claimant's Wal-Mart medication printout from November 5, 2015. The printout appeared to indicate that the claimant had not filled a prescription since February 2, 2015. However, the ALJ did not take into account the February 24, 2015, Good Samaritan Clinic appointment at which the claimant received a prescription refill for Prozac. Furthermore, at her Good Samaritan Clinic follow-up appointment on November 3, 2015, the report discussed the decrease of the claimant's Prozac dosage because she was experiencing sleep problems while taking Prozac. The ALJ also failed to account for the medication record from Good Samaritan Clinic that included Prozac on the list of the claimant's current medications as of December 1, 2015. (*See* R. 687, 781-82).

Furthermore, the ALJ contradicted himself in his analysis of the claimant's lack of mental impairment. He first stated, "She has not reported ongoing mental issues to any doctor." However, in the following paragraph he adds, "However, in light of Dr. Storjohann's diagnoses and the fact that claimant has been treated for depression by his [*sic*] primary care physician at GSC, the undersigned finds the claimant does have mental impairments." It cannot be true both that the claimant has reported *no* mental issues to any doctor and that the claimant has been treated for depression by her primary care physician. Furthermore, the ALJ wrote "At her most recent follow-up with GSC in January 2016 she had no complaints." However, that statement is wrong. A Good Samaritan Clinic nurse[7] reported discussing depression, along with three other issues, with the claimant on January 5, 2016. (R. 19, 778).

Additionally, the ALJ gave "some weight" to the opinions of both Dr. Storjohann and Dr. Estock. However, these two doctors had diametrically opposite opinions. In Dr. Storjohann's opinion, the claimant is severely mentally impaired, whereas Dr. Estock who only had a phone call with the claimant found that the claimant does not have any mental impairment whatsoever. The ALJ accorded both opinions "some weight." Given their completely opposing viewpoints, the court finds curious that the ALJ could find both equally relevant. The weight of the substantial evidence in the record appears to support Dr. Storjohann's opinion more than Dr. Estock's opinion.

Although the claimant sought treatment in the emergency room only once for a panic attack following a night of alcohol consumption, she testified under oath that she suffers from multiple panic attacks on a weekly basis even while taking her medication. The ALJ noted that the claimant has never had any professional mental health treatment. But, the ALJ ignored the fact that the Good Samaritan Clinic referred the claimant to a professional mental health facility,

---

[7] The nurse's signature on the Good Samaritan Clinic report is illegible.

and that the claimant testified that she could not get an appointment because the facility is full.[8] (R. 49).

The ALJ also never addressed the consistent and serious nature of the claimant's depression, and the ALJ has a responsibility to view the doctor's opinion in light of the evidence as a whole. *See Brown*, 442 F. App'x at 511. Dr. Storjohann reported that the claimant suffers from serious depression and attempted suicide at fifteen by cutting her wrists. Furthermore, Good Samaritan Clinic records between 2014 and 2016 consistently listed depression as an ongoing, serious issue for the claimant. The ALJ only mentioned the Good Samaritan Clinic reports and never stated with particularity any level of weight accorded to them or addressed their discussion of the claimant's mental concerns. The December 9, 2014, Good Samaritan Clinic report stated that the claimant's depression was serious enough that she should be treated at Indian Rivers Mental Health Center. The ALJ also failed to mention that the claimant testified under oath that she experienced suicidal depression as an adult. (R. 689, 778-81, 789).

The reasons the ALJ gave to discount Dr. Storjohann's diagnosis and opinion regarding the claimant's mental limitations lack merit and substantial evidence does not support them, which constitutes reversible error. *See Henry*, 802 F.3d at 1268 (Because substantial evidence did not support the ALJ's determination to give a consulting opinion less weight, the court reversed.) Furthermore, the ALJ failed to seriously consider or address a significant portion of the claimant's mental health record. For these reasons, the court finds that substantial evidence does not support the ALJ's disregard of Dr. Storjohann's opinion regarding the claimant's mental limitations.

## VII. CONCLUSION

---

[8] The claimant testified under oath that she has been unable to get mental treatment because an appointment at Indian Rivers Mental Health Center where she was referred is "three years down the line."

For the reasons stated above, this court concludes that the decision of the Commissioner is due to be REVERSED AND REMANDED for further consideration consistent with this Memorandum Opinion.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 21st day of September, 2018.

 

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE